FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 2 4 2009 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NICHOLAS COROZZO,<br>                        Defendant. | MEMORANDUM<br>& ORDER ON<br>CONDITIONS IN<br>PRISON AND ON<br>SUPERVISED RELEASE<br><br>08-CR-76 |

**JACK B. WEINSTEIN, Senior United States District Judge:**

## I.     Introduction

In the sentencing of this sixty-nine year old captain and killer for the mafia, the government requests that severe conditions be imposed by the court on his imprisonment and supervised release, limiting his right to interact with: 1) relatives who were or are criminals; and 2) members or associates of organized crime families. Even if modified, the restrictions sought would probably result in long-term solitary confinement, onerous segregation, and alienation from natural family.

The request is considered from chambers high in the new federal courthouse for the Eastern District of New York, with grave historical memories sunk into its foundations and rising into surrounding atmosphere. On these sanctified grounds, cruelty to American prisoners was first practiced on a mass scale.

The deadliest battle of the Revolutionary War was fought here on August 27, 1776, when Washington's Army was defeated. *See, e.g.*, Barnet Schecter, *The Battle for New York* 141-54 (2002). Thousands of American prisoners captured in that engagement and in those that followed were incarcerated in British prison ships anchored in New York harbor, and in the

1

City's sugar houses. *See* Edwin G. Burroughs, *Forgotten Patriots: The Untold Story of American Prisoners During the Revolutionary War* (2008). There they were packed in one upon another, denied warmth in bitter winter, light, clothing and sanitary facilities, and stifled without ventilation in summer heat. They died by the thousands – Whites and Blacks, sailors and soldiers of the new Republic. For years their bones washed up on the beaches of Brooklyn. Their remains are interred in the Prison Ship Martyrs Monument at Fort Greene, a short walk from the courthouse.

In the Civil War, captured Union soldiers from surrounding neighborhoods in Brooklyn and the rest of the North were imprisoned in Southern camps like Andersonville. They died by the tens of thousands of disease, exposure and starvation resulting from almost unimaginably cruel conditions. *See, e.g.*, Alan Huffman, *Sultana* 126-61 (2009); William Marvel, *Andersonville: The Last Depot* (1994). (Down the street from the courthouse is a statue of the abolitionist Henry Ward Beecher, freed children at his feet, "the grateful gift of multitudes of all classes creeds and conditions at home and abroad to honor the great apostle of the brotherhood of man," and across the park from the court is his church, which Lincoln attended before his Cooper Union speech that led to his election and was followed by the Civil War.)

Visible from the courthouse is the monument to the members of our armed forces in World War II, who fought against the forces of Hitler, Stalin and Hirohito responsible for deaths of tens of millions of prisoners they and their underlings treated with brutality. Some American soldiers suffered particularly harsh treatment because of their religion; the Germans consigned members of our armed forces taken prisoner in battle to harsh and harrowing conditions, forcing them to work in tunnels without adequate shelter or food, under killing conditions, and then herding them in forced marches to die of exhaustion and disease. *See, e.g.*, Roger Cohen,

2

*Soldiers and Slaves: American POWs Trapped by the Nazi's Final Gamble* (2005); Flint Whitlock, *Given Up For Dead: American GI's in the Nazi Concentration Camp at Berga* (2005). Among others, the Japanese tortured and sent to hard labor in their Northern mines American submariners captured in the Pacific. *See, e.g.,* Jonathan J. McCullough, *A Tale of Two Subs: An Untold Story of World War II, Two Sister Ships, and Extraordinary Heroism* 264-74 (2008). *Cf.* John W. Dower, *Embracing Defeat* 446 (1999) ("incidence of death among American and British Commonwealth prisoners of the Japanese was estimated to have been 27 percent"); *id.* at 27-28 ("[Emperor Hirohito's] moral responsibility . . . was transparent; and in choosing not merely to ignore this but to deny it, the Americans came close to turning the entire issue of war responsibility 'into a joke.'") Here, in Brooklyn, reside some of the few survivors of Hitler's and Stalin's death camps.

Observable from the courthouse is a monument honoring those who served in the Korean War, where torture was used by Chinese interrogators of American prisoners. *See, e.g.,* Scott Shane & Mark Mazetti, *In Adopting Harsh Tactics, No Inquiry Into Past Use: Interrogations Based on Torture Methods Chinese Communists Used in '50s*, N.Y. Times, Apr. 22, 2009, at A1. *Cf. e.g.,* John McCain, *Faith of My Fathers* (1999) (torture of American prisoners during the Vietnam War).

So, when the government seeks to impose terms that make life in prison and on supervised release harsher than necessary, the United States District Court for this district cannot ignore history and this country's aspiration to provide justice for all. It must seriously consider whether it would be justified in granting the government's motion to impose cruel prison conditions.

II. The Statute

3

The government asked the court to impose as part of a sentence of thirteen and one half years in prison – a term within the range agreed upon by the United States and the defendant –, an order, pursuant to Section 3582(d) of Title 18, barring the defendant from associating or communicating with any member or associate of organized crime during his incarceration and supervised release. *See* Gov't Letter, Apr. 16, 2009, Docket Entry ("D.E.") No. 1990. Defendant has close relatives who are members of organized crime.

The statute provides:

(d) **Inclusion of an order to limit criminal association of organized crime and drug offenders.**—
The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter upon motion by the Director of the Bureau of Prisons or a United States attorney, may include *as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*

18 U.S.C. § 3582(d) (emphasis added).

Section 3582 is almost never used. Apparently it was utilized by a district court in only one reported case in this judicial circuit. *See United States v. Felipe*, 1997 WL 220302 (S.D.N.Y. Apr. 29, 1997). In *Felipe*, the court imposed conditions barring the defendant from contact with any other prisoner and allowing communication and visits only with specified close family members. 1997 WL 220302, at *1. The Court of Appeals for the Second Circuit approved on the ground that the prisoner had ordered murders from his cell.

We emphasize finally that the restrictions imposed upon Felipe's ability to communicate while serving *at least the initial part of his*

4

*life sentence* appear appropriate to us based on the singular and
brutal facts revealed by this record. Felipe ordered the murders of
at least six individuals from his jail cell.

*United States v. Felipe*, 148 F.3d 101, 111 (2d Cir. 1998) (emphasis added). Even so, it limited its approval of the conditions to only the beginning of the sentence. *Id.* While the Court of Appeals for the Second Circuit has suggested that a district court may maintain jurisdiction to modify a section 3582(d) order at any time during the period of incarceration, *id.*, interference with the Bureau of Prisons execution of a sentence is a dubious extension of court jurisdiction over prison conditions and would normally be considered by a court in the venue in which the prisoner is being held, not by the court that imposed the sentence.

The court's power under Section 3582 is, in any case, discretionary. *See* 18 U.S.C. § 3582(d) ("The court . . . *may* include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person). (emphasis added).

## III. Application of Statute in Prison

At the sentencing hearing and a subsequent argument, the government reiterated its request for the restrictions already referred to. Defense counsel raised a concern that the government's requested order would have the practical result of imposing solitary confinement on the defendant because of the substantial number of members and associates of organized crime in federal prisons. *See* Sentencing Tr. 14, Apr. 17, 2009. The defendant argued that "a prohibition on associating or communicating with organized crime members and associates . . . [in prison] will likely result in unduly harsh conditions of confinement, including designation to a distant facility where visits from his wife, daughters and grandchildren will be difficult; designation to a higher security facility than would otherwise be expected; and isolation by

5

segregation or separation from other inmates." Def.'s Letter, Apr. 21, 3009, D.E. No. 1999, at 1-2.

The government suggested some modifications of its proposed order, *see* Gov't Letter, Apr. 22, 2009, D.E. No. 2006, but they did not meet defendant's objections. The court was unable to devise an order that would grant the government's request without leading to a substantial likelihood of particularly harsh prison conditions for this defendant. Imposition of the terms sought by the government would almost certainly lead to incarceration in a "supermax" prison, solitary confinement or segregation. Yet, there is no evidence that this defendant – unlike the defendant in *Felipe* – is more dangerous to other prisoners, guards, or to outside society, than are others of his ilk who do not suffer these restrictions.

Whether for religious or secular reasons, human beings require the company of other humans to stay healthy. *Cf., e.g., Wilson v. Beame*, 380 F. Supp. 1232, 1238-42 (E.D.N.Y. 1974) (prison and communal nature of organized religion). Substantial research demonstrates the psychological harms of solitary confinement and segregation.

Supermax prisons], solitary confinement and segregation] inflict varying amounts of psychological pain and emotional trauma on prisoners confined in them. The range of psychopathological reactions to this form of confinement is broad, many of the reactions are serious, and the existing evidence on the prevalence of trauma and symptomatology indicates that they are widespread. The mental health risks posed by this new form of imprisonment are clear and direct.

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 148 (2003). Harms resulting from these forms of punishment may seriously inhibit rehabilitation.

The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, producing a stuporous condition associated

6

with perceptual and cognitive impairment and affective disturbances. . . . But even those inmate[s] who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation. Moreover, the harm caused by such confinement may result in prolonged or permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison.

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 354 (2006) (reporting severe psychiatric harm caused by solitary confinement); *see also, e.g.*, Bruce A. Arrigo & Jennifer Leslie Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What Should Change*, 52 Int'l J. of Offender Therapy & Comp. Criminology 622 (2008) (collecting research on long-term solitary isolation and recommending reform ); Tracy Hresko, *In the Cellars of the Hollow Men: Use of Solitary Confinement in U.S. Prisons and its Implications Under International Laws Against Torture*, 18 Pace Int'l L. Rev. 1 (2006) (arguing for reform in the use of solitary confinement in the United States); Atul Gawande, *Hellhole: The United States holds tens of thousands of inmates in long-term solitary confinement. Is this torture?*, The New Yorker, Mar. 30, 2009, at 36 (describing psychological effects of isolation).

Assuming the order the government seeks in this case is constitutional, the court elects not to exercise its discretion to issue it. It is expected that this defendant, like all others, will have telephonic and visiting privileges with his natural family. The Bureau of Prisons has adequate power to exercise appropriate controls reducing opportunities for a defendant to participate in organized crime, without resorting to harsh confinement.

**IV.    Denial of Association with Family Members While on Supervised Release**

Even though non-association with other criminals is routinely ordered for a defendant on supervised release (and was ordered in the present case), it is not desirable to cut off familial association. Integration into society requires strong family relationships. Should interactions with relatives result in the possibility of further crime, conditions such as the right of probation officials to search the home of the releasee and to monitor and control calls and other activities, and power of the court to send the defendant back to prison, exist in the case of this and other defendants. *See* Sentencing Tr. 9, Apr. 17, 2009.

Family relationships are essential for rehabilitation. *See, e.g.*, 18 U.S.C. § 3622 ("The Bureau of Prisons may release a prisoner from the place of his imprisonment for a limited period . . . if such release appears to be consistent with the public interest and if there is reasonable cause to believe that a prisoner will honor the trust to be imposed in him, by authorizing him, under prescribed conditions, to . . . visit[] a relative who is dying . . . attend[] a funeral of a relative . . . [or] establish[] or reestablish[] family or community ties."); Fed. Bureau of Prisons, Program Statement 5267.08 (2006) ("The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community."); Dan Markel, Jennifer M. Collins & Ethan J. Leib, *Criminal Justice and the Challenge of Family Ties*, 2007 U. Ill. L. Rev. 1147, 1216-17 (2007) ("In the context of corrections, we cannot ignore that the family can play a central role in facilitating successful prisoner reentry, one of the most important, if often overlooked, functions of our penal system.").

Unnecessary denial of contact with family stunts rehabilitation and violates basic human rights. Chief Judge Judith S. Kaye summarized the essence of much of our modern sentencing jurisprudence, and the enormous weight of experience supporting it, when she noted, "by

working on programs that enable families to stay together . . . we believe we are on the right track to delivering justice in the twenty-first century." Judith S. Kaye, *Reducing the Human Costs in Family and Criminal Court Cases*, ABA Judges' Journal, Spring 2006, at 1, 40. *See also, e.g.*, Christy A. Visher, *Returning Home: Emerging Findings and Policy Lessons about Prisoner Reentry*, 20 Federal Sentencing Reporter 93, 94-95 (Dec. 2007) (describing the purpose of the Urban Institute Returning Home project: "to develop a deeper understanding of the reentry experiences of returning prisoners, their families, and their communities"); Universal Declaration of Human Rights, art. 16(3), G.A. Res. 217 (III) (Dec. 10, 1948) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."); Notes and Essay, *The Role of Judges in a Government Of, By, and For the People*, 30 Cardozo L. Rev. 1, 205 (2008).

V. Conclusion

The request of the government for an order under Section 3582(d) of Title 18 is denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: April 23, 2009
Brooklyn, New York